**RECORD IMPOUNDED**

> **NOT FOR PUBLICATION WITHOUT THE**
> **APPROVAL OF THE APPELLATE DIVISION**
>
> This opinion shall not "constitute precedent or be binding upon any court."
> Although it is posted on the internet, this opinion is binding only on the
> parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5783-13T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

C.E.L.,[1]

    Defendant-Appellant.

_____

> Argued October 19, 2017 — Decided August 31, 2018
>
> Before Judges Simonelli, Haas and Rothstadt.
>
> On appeal from Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 11-03-0672.
>
> Louis H. Miron, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Louis H. Miron, on the briefs).
>
> Annmarie Cozzi, Senior Assistant Prosecutor, argued the cause for respondent (Gurbir S. Grewal, Bergen County Prosecutor, attorney; Annmarie Cozzi, of counsel and on the brief).

---

[1]  Because this matter involves the sexual assault of defendant's minor daughter, we use initials to identify those individuals involved in this matter pursuant to Rule 1:38-3(c)(9) and N.J.S.A. 2A:82-46.

PER CURIAM

Following a jury trial, defendant C.E.L. was convicted of first-degree aggravated sexual assault of a victim less than thirteen years (his four-year-old daughter, C.L.), N.J.S.A. 2C:14-2(a)(1) (count one); second-degree sexual assault of a victim less than thirteen years old, N.J.S.A. 2C:14-2(b) (count two); second-degree sexual assault of a victim less than thirteen years old, N.J.S.A. 2C:14-2(b) (count three); second-degree sexual assault of a victim less than thirteen years old, N.J.S.A. 2C:14-2(b) (count four); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count five); third-degree hindering prosecution by preventing or obstructing the child victim from providing testimony or information that might aid in his discovery or apprehension or in the lodging of a charge against him, N.J.S.A. 2C:29-3(b)(3) (count six); fourth-degree endangering the welfare of a child by possessing or viewing child pornography, N.J.S.A. 2C:24-4(b)(5)(b) (count seven); and fourth-degree tampering with evidence by attempting to delete images of child pornography from a computer, with the purpose of impairing its verity or availability in an official proceeding or investigation, N.J.S.A. 2C:28-6(1) (count eight).

The trial judge denied defendant's post-trial motion for judgment of acquittal or a new trial. The judge sentenced

2                                                        A-5783-13T1

defendant to a fifteen-year term of imprisonment on count one; a consecutive term of seven years on count two; concurrent terms of seven years on counts three, four, and five; a consecutive term of three years on count six; a consecutive term of one year on count seven; and a concurrent term of one year on count eight. Megan's Law, parole supervision for life, and the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, applied to various counts. Thus, defendant's aggregate sentence was twenty-six years, with a twenty-two-year period of parole ineligibility.

On appeal, defendant raises the following contentions:

    I.    THE TRIAL COURT ERRED IN ADMITTING THE [STATE v. MICHAELS, 136 N.J. 299 (1994)] INTERVIEW INTO EVIDENCE AND PERMITTING THE JURY TO REVIEW THE VIDEO RECORDING FOUR TIMES DURING THE TRIAL AND DELIBERATIONS.

        A.    The Recording of the Michaels Interview Should Have Been Ruled Inadmissible Based Upon the Totality of Circumstances, Particularly Where C.L.'s Statements Following the Suspicious and Inexplicable "Blackout" Period Were Materially Different and Diametrically Opposed to Every Other Statement Made by C.L. Prior To and After the "Blackout" Period.

        B.    The Trial Court Should Not Have Permitted the Jury to Review the Michaels Interview Recording on Four Separate Occasions During

3

the Trial and Deliberations in Violation of [State v. Burr, 195 N.J. 119 (2008)] and its Progeny Because It Resulted in The Jury's Giving More Weight to C.L.'s Statements After the "Blackout" Period Than to C.L.'s Testimony During Trial.

II.  THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT RULED THAT [DEFENDANT] WOULD NOT BE PERMITTED TO USE THE AUDIO RECORDINGS MADE BY [DEFENDANT'S] WIFE, M.L., AT THE AUDREY HEPBURN CHILDREN'S HOUSE AND THE EXCLUSION OF THE RECORDINGS VIOLATED [DEFENDANT'S] DUE PROCESS RIGHTS AND HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION.

III. THE TRIAL COURT SHOULD HAVE GRANTED [DEFENDANT'S] MOTION FOR A MISTRIAL OR A CONTINUANCE UPON LEARNING THAT THE STATE DID NOT PRODUCE THE DISCOVERY CONCERNING [W.K.'s] CELL PHONE, WHICH CONTAINED SIGNIFICANT IMPEACHMENT INFORMATION ABOUT [W.K.] AND EXCULPATORY EVIDENCE FOR [DEFENDANT], UNTIL DURING THE TRIAL.

IV.  THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURORS FULLY AND ADEQUATELY CONCERNING THEIR [AVOIDING] EXTRANEOUS INFORMATION FROM OUTSIDE OF THE COURTROOM AND IN FAILING TO VOIR DIRE THE JURORS UPON THEIR RETURNING TO THE COURTROOM FOR TRE TRIAL MORE THAN ONE MONTH AFTER THE JURY HAD BEEN SELECTED. [(Not raised below).]

V.   THE [TRIAL] COURT ABUSED ITS DISCRETION IN DENYING [DEFENDANT'S] MOTION [TO] SEVER THE SEXUAL ASSAULT COUNTS (ONE THROUGH SIX) FROM THE COUNTS RELATING TO THE CHILD PORNOGRAPHY (SEVEN AND EIGHT).

VI.     THE TRIAL COURT ERRED IN NOT GRANTING
        [DEFENDANT'S] MOTION TO DISMISS THE
        INDICTMENT BECAUSE THE STATE FAILED TO
        PRESENT MATERIAL EXCULPATORY EVIDENCE
        TO THE GRAND JURY.

VII.    THE TRIAL COURT ABUSED ITS DISCRETION
        IN DENYING [DEFENDANT'S] MOTION FOR
        JUDGMENT OF ACQUITTAL AND FOR A NEW
        TRIAL OR, ALTERNATIVELY, [DEFENDANT'S]
        CONVICTION SHOULD BE VACATED AND THIS
        COURT SHOULD ORDER A NEW TRIAL BASED
        UPON THE CUMULATIVE EFFECT OF THE TRIAL
        COURT'S ERRORS THROUGHOUT [DEFENDANT'S]
        PRE-TRIAL PROCEEDINGS AND THROUGHOUT
        HIS TRIAL.

VIII.   THE TRIAL COURT ABUSED ITS DISCRETION IN
        SENTENCING [DEFENDANT] TO SUCH A
        DRACONIAN AND UNJUST SENTENCE BASED UPON
        THE RECORD AND, THEREFORE, [DEFENDANT'S]
        SENTENCE SHOULD BE VACATED.

We reject these contentions and affirm.

I.

Trial Testimony Relevant to the Issues
Raised On Appeal

On October 6, 2010, C.L.'s nanny, W.K., was caring for C.L. and her brother, E.L., while defendant and the children's mother, M.L., attended a baseball game. W.K. testified she began working for the family in May or June 2010, but knew them for much longer because her mother and cousin preceded her as the children's nanny. That afternoon, the children had an after-school playdate at their home with some friends. The friends' father, J.M., stayed for the playdate and looked after the children with W.K. At some point

C.L. defecated in her underpants, so W.K. took her upstairs to shower. W.K. testified that C.L. frequently urinated and defecated in her underpants, and she always had to be very gentle with C.L. because she was unusually sensitive and never liked to be wiped in her genital area.

Before taking C.L. out of the shower, W.K. asked if anybody had ever "touched her there [meaning the genital area] on the playground or in school[.]" W.K. had twice asked C.L. this question in the past because of her concern about C.L.'s unusual objections to being wiped, and C.L. said "no" each time. This time, however, C.L. hesitated and was silent for a few seconds. Then, looking at her feet, she said "yes, Daddy does."

W.K. froze and pretended not to hear what C.L. said because it was so unexpected. She told C.L. she was going to get her new underwear and they would go back to play. She then got C.L. dressed and they went downstairs to rejoin the playdate. W.K. remained shocked and told J.M. what C.L. said. J.M. suggested she speak more with C.L., and expressed that maybe C.L. simply meant her father sometimes wiped her too hard.

Later that evening, W.K. took the children upstairs for E.L.'s shower. While E.L. showered, W.K. spoke to C.L. in her parents' bedroom. C.L. answered "no" when W.K. asked if she remembered what she told W.K. earlier and if she meant that her daddy washed

or wiped her.  W.K. then asked C.L. "when does that happen?," and C.L. answered "usually, when nobody is home."  W.K. asked where her mother and brother were, and C.L. said they were "out shopping or something like that."  C.L. was behaving normally while she spoke and at some point jumped off her parents' bed and began walking around.

W.K. then asked C.L. if she could tell her what her daddy does.  C.L. climbed back on the bed and said "Daddy tell[s] me to take the winky into my hands and go really, really, really, fast[,]" moving her hands quickly up and down while making this disclosure. "Winky" was C.L.'s word for penis.[2]  C.L. then came close to W.K., as if she were going to whisper in her ear, and said "I'll tell you something."  W.K. asked "what happened?" and C.L. said "I don't know what's inside; and she pointed on the private area; but, something white comes out."  C.L. then started giggling and W.K. giggled with her.  C.L. then pointed to the left side of her parents' bed, indicating it happened there.

W.K. asked if there was anything else, and C.L. said "Daddy puts medicine on his winky."  C.L. then started looking for the medicine, which she found in a nightstand on her mother's side of the bed.  She showed it to W.K., who saw it was a tube of KY

---

[2]  The word is spelled winky or winkie, interchangeably, throughout the record, and sometimes the word "weenie" is used instead.

lubricant. While C.L. made these statements she was acting normally, no differently than if she were telling her something that happened at school. W.K. then asked if there was anything else, and C.L. took W.K. by the hand and led her to the doorway of her bedroom. C.L. pointed to her bed and said that "last Sunday she took winky to her mouth. And she went ill."

W.K. brought C.L. back to her parents' bedroom, sat on their bed, and told C.L. "you know that Daddy's not supposed to do this." C.L. responded "yes, Daddy told me that it was wrong" and she "should not say anything to Mommy. Because she would throw me and Daddy out of the house." C.L. got quiet for a second, and then said to W.K., "But you won't; right?," to which W.K. answered "no; of course not."

At this point, E.L. exited the shower and W.K. put C.L. in the shower. W.K. put the children to bed after they showered and were in their pajamas. W.K. then spoke to J.M., who testified that W.K. seemed "upset" and "shaken" by what C.L. told her. He advised her to act as normally as possible when the children's parents came home, explaining he did not want them to coach C.L. or tell her not to repeat what she told W.K. W.K. followed J.M.'s advice and did not speak with M.L. about what C.L. told her, explaining she did not think M.L. would believe C.L. over defendant.

A-5783-13T1

After leaving defendant's home that night, W.K. went to J.M.'s home and he gave her a cassette recorder to document what C.L. said. However, W.K. never recorded or wrote down anything. J.M. also told W.K. that he would speak with a friend of his who was a police officer to ask for advice.

The next day, W.K. returned to defendant's home to work. After dropping E.L. off at school, she allowed C.L. to play at the playground. She then took C.L. to her mother's house and then to a nearby park. W.K. did not speak to C.L. about anything they discussed the previous day, but spoke with her mother about the situation.

Meanwhile, that morning J.M. went to the police and told Sergeant Daniel Kellogg what occurred the previous day, including C.L.'s disclosures of sexual abuse. He did not identify W.K. or C.L. by name because he was friendly with defendant and his family, and W.K. was frightened to speak with the police. Kellogg told J.M. he had to speak with the child and her nanny immediately. He also advised J.M. not to use the tape recorder, and asked him to contact the nanny and encourage her to contact him, which J.M. did.

Kellogg then contacted the Bergen County Prosecutor's Office (BCPO) regarding how to proceed. He was advised to identify the child and have her brought to the Audrey Hepburn Children's House

(AHCH) to be interviewed.[3]

Kellogg subsequently received a call from W.K. She identified herself as the nanny J.M. spoke to him about, and told Kellogg what C.L. had told her. Kellogg asked to meet with her so that the BCPO could conduct an investigation; however, she would not reveal her identity or agree to meet. She testified she was scared to put the children through an investigation or have them taken away from their parents when she "didn't know if it was even true."

Kellogg gave W.K.'s cell phone number to the BCPO, which provided him with her name and home address. Kellogg then searched for W.K. in the Police Department's in-house record management system and discovered she had been involved in a minor motor vehicle accident eight days earlier, with E.L. and C.L. in the vehicle.

Kellogg called W.K. and told her he knew her name and address, knew the family she worked for, and needed to speak with her that day. Kellogg also contacted M.L. and told her to meet him at the AHCH in connection with an investigation of child abuse or neglect. After hearing that M.L. was going to the AHCH, W.K. agreed to meet with the police. She told C.L. only that they "were going to meet

_____

[3]   The AHCH is a regional diagnostic center where investigators conduct forensic interviews of children related to alleged sexual and physical abuse, and where the children can be seen by doctors and psychologists.

up with Mommy."

M.L. called defendant after she spoke with Kellogg. Between 1:19 p.m. and 5:42 p.m., she and defendant exchanged eight phone calls and two text messages. However, defendant testified to knowing only that M.L. would be meeting with the police with respect to W.K. and C.L. He also testified he believed W.K. may have done something wrong and said he and M.L. discussed possibly hiring a new babysitter and that he would have to pick up E.L. after school. Defendant denied knowing or suspecting he was under investigation. When presented with evidence he was in contact with three attorneys that afternoon, while he claimed he was with E.L. at Dunkin' Donuts and a toy store, he denied any recollection of those calls.

Detectives Cora Taylor and Barbara Stio from the BCPO's sex crimes unit were assigned to investigate C.L.'s allegations of sexual abuse. Taylor worked at the BCPO for fourteen years, including eight years in the sex crimes and child abuse unit, where she was trained in how to conduct forensic interviews of children. She conducted over 100 interviews of young children.

Stio worked as a law enforcement officer for twenty-five years, the first thirteen with the Bergen County Sheriff's Office, and the last twelve with the BCPO. She worked on sex crimes investigations for seven years, was trained in conducting forensic

11

interviews of children, and conducted over 400 interviews.

When Taylor and Stio arrived at the AHCH, they first spoke with Kellogg, Detective Mike Musto from the Wyckoff Police Department, and Olivia Troche from the New Jersey Division of Youth and Family Services (Division),[4] and explained how the investigation would proceed. The officers and Troche next briefly met with W.K., with Stio questioning her, in order to discover the nature of the allegations she heard from C.L. From this meeting, Taylor understood "there was touching of the private parts."

After meeting with W.K., the group spoke with M.L. Stio testified that M.L. was advised "why we were there and that a forensic interview was about to take place of her daughter to find out what the nature of the allegations truly were." M.L. was also advised that defendant was the suspected perpetrator. M.L. remained in the waiting room with W.K. while C.L. was interviewed. They did not discuss what C.L. told W.K.

Taylor conducted the forensic interview of C.L. while Stio watched by closed circuit television from an observation room, along with Troche, Kellogg, and Musto. Taylor's interview of C.L. was videotaped and transcribed, except for an approximately twenty-minute portion that was not taped because the recording

---

[4] The Division is presently known as the New Jersey Division of Child Protection and Permanency.

equipment malfunctioned. The malfunction was resolved and the videotaping resumed. Taylor was not advised of the malfunction until after the interview concluded.

Because it is protocol to interview a child only one time, start to finish, Taylor's interview of C.L. continued during the break in recording. The observers could not watch the interview during that time period, but could hear it. Therefore, that part of the unrecorded interview was memorialized in Stio's contemporaneous notes and officers' reports.

Taylor testified she used the rapport, anatomy, touch, abuse scenario, and closure (RATAC) format during the interview. RATAC is "a protocol that's used to elicit information from a child in a credible and reliable way." Interviewers using this format are trained to pose open-ended, free recall questions, and not leading or suggestive questions, so the child has the opportunity to give a narrative. However, interviewers may pose "[f]ocus questions[,]" once the child has described some type of abuse, in order to obtain additional information and discover whether any abuse actually occurred. Interviewers also must take into account the age and cognitive ability of the child.

During the rapport stage, the interviewer tries to make the child comfortable and establish communication. During the anatomy stage, the interviewer finds out what terms the child uses to

identify his or her body parts, so those terms may be used during the interview. During the touch stage, the interviewer explores the child's understanding of touches and what touches the child likes or does not like. During the abuse scenario stage, the interviewer explores whether any kind of abuse occurred. Finally, in the closure phase, the interviewer closes the interview and establishes a safety plan for the child, so the child knows he or she has someone to tell if anything were to happen again.

During the touch stage of C.L.'s interview, she responded "no" when Taylor asked whether anyone had touched her "peepka" (C.L.'s word for vagina) in a way she did not like. Taylor proceeded with the interview nonetheless because the RATAC format provides a process of inquiry, and she knew that "disclosure is a process."

Soon after this question and response, the recording equipment malfunctioned, but the interview continued. Stio testified that Taylor's tone of voice remained the same during the break in recording, Taylor never cajoled C.L., showered her with praise, or offered her rewards, and C.L. made no requests to terminate the interview.

Stio and Taylor testified that during the break in recording, Taylor moved from questioning C.L. about body parts to questioning her about who assisted her in cleaning her body. C.L. said her

mother was her primary caretaker, with her nanny also assisting, and her father cleaned her only when her mother was not home. Stio testified that C.L. said that her mother sometimes touched her peepka in order to apply a special ointment when she had accidents or when her peepka burned. However, her father did not do this; her mother did all the work. C.L. also said there were two special ointments.

Taylor next spoke with C.L. about boys' body parts, and C.L. stated she had seen her brother's winky but never touched it. Taylor next asked C.L. if she knew why she was there, and C.L. said that W.K. drove her and she was there because she needed her mommy's help. Taylor then asked C.L. about her conversation with W.K. the day before, about whether anyone had touched her "dupee" (C.L.'s word for butt) or peepka, and C.L. responded that she had talked to W.K. about touches and "yucky things." Taylor told C.L. that W.K. shared with her what C.L. told W.K., but did not tell C.L. what W.K. said.

C.L. then told Taylor that her mother uses a special ointment that is white when she has accidents, or because her peepka burns, and her father sometimes uses ointment because he "just wants to." She then disclosed that her father sometimes puts his finger into her peepka. Taylor asked C.L. where these things happened, and what people were wearing. C.L. responded that it happened in her

father's bedroom, on his bed, her father was wearing no clothing, so she could see his winky and dupee, and they were watching Princess Dora on television. She also said she lay down on the bed, her father told her to open the winky ointment, and he touched his winky and also touched her peepka with his finger. According to Taylor, C.L. also described straddling her father's body and rubbing winky ointment on his winky.

Taylor asked C.L. if her father ever asked her to do anything funny to his winky, and C.L. said sometimes "white stuff" comes out of "the little hole." Taylor asked what was going on, and C.L. said her father sometimes touched his winky while putting his finger in her peepka. However, C.L. said her father's winky had never touched her peepka or dupee.

At this point, the recording resumed. C.L. said that her father sometimes "touches wrong" by touching his winky while putting his finger in her peepka, and that while he was doing that he is also "texting and watching tv" with her. She said that "white stuff" comes out of his winky, after which he walks to the bathroom and washes off.

Taylor asked C.L. if her father ever used anything on his winky, and C.L. responded that he used a special winky ointment that was in one of his drawers, like she showed her nanny. Taylor asked C.L. to describe the bottle of ointment, and she said "it

16

has the spell on it[,]" but she did not know how to spell it. Stio understood C.L. to be saying that the bottle had letters on it, causing her to jot down a question in her notes as to whether C.L. was referring to KY lubricant. Taylor asked C.L. how she felt about this, and C.L. responded that "[a]fter it makes me feel lame, dumb." She also said it made her feel "[b]ad[,]" "[b]ecause it's private" and "a bad occasion."

Taylor asked C.L. if her father ever talked to her about whether she should tell somebody about what he was doing with her. She responded that her father said to her "please, please, [C.L.] don't say no." C.L. also said he made her promise not tell anybody.

Taylor then asked C.L. if her father had ever asked her to touch his winky, and C.L. initially said "no," looking away from Taylor as she said it. However, after Taylor said "Remember, what I told you, everything that we talk about in here is the truth[,]" C.L. changed her answer and said "sometimes he tells me to touch it." Taylor denied she was chiding C.L., or suggesting that her answer was untruthful. She testified she made this remark about truthfulness in the context of C.L.'s demeanor in turning away from her and backing into a corner.

Taylor then asked C.L. to tell her about it, and C.L. responded that her father would put the special ointment on her

hand, and at his request she would put the ointment on his winky and just above his winky and then get on top of him. Taylor next asked C.L. if her father's winky had ever touched her peepka and she said "For that - - no." C.L. responded "no" when Taylor asked if her father's winky had ever touched her dupee or her butt, or if her peepka ever got on her father's weenie.

Using anatomically correct dolls, Taylor then went through C.L.'s statement about what her father did with her. Just before using the anatomical dolls, however, C.L. asked Taylor if she could tell her mother something. Taylor answered no, but added that they were going to talk to her mother after they were done. C.L. asked when they would be done, and Taylor said in a few minutes. Taylor also asked C.L. if there was any reason she needed to talk to her mother at that moment, and C.L. said no.

Using the anatomically correct dolls, C.L. took off all of their clothing, explaining that this was what she and her daddy did while her mother and brother were not home. She said that "we both stand up before we do it and then we give kisses." She then explained how her daddy lay down on the bed and she sat on top of him, he touched his weenie, she put her hands on his weenie, and his weenie touched her peepka.

In response to Taylor's questions, C.L. said it hurt when her father put his hand in her peepka, and that his hand was not wet,

18

but his weenie was. She also described going to the bathroom with her father and watching him pee on the potty. Taylor asked C.L. how all of this made her feel, and C.L. said it made her feel "disgusted[.]" She also said she never told her father how it made her feel.

Taylor asked C.L. when was the last time she and her father had lay down and he put his finger in her peepka, and she said yesterday morning, while her mother was at work and her brother was at school and before the nanny arrived. Taylor testified that in asking this question she understood that four and five-year-old children are generally unable to answer questions about timing of their abuse. Moreover, C.L. said these incidents happened more than once.

Taylor then asked C.L. if her father ever said what would happen to her if she told somebody, and C.L. responded that he told her she would "get in trouble" and "Get kicked by . . . mom." C.L. said she believed this would happen because her father said it, and she said she loved her father, mother, brother, W.K., and grandmother.

Finally, Taylor asked if everything C.L. had told her about what she did with her father was the truth, and C.L. responded it was. Taylor asked C.L. if there was anybody she could tell if she was being touched in a way she did not like, and C.L. responded

she could tell Taylor. Taylor asked C.L. if she could talk to her mom, and C.L. said no, because her mom would be upset because it was not a proper thing to do.

Taylor asked if C.L. ever told her nanny about this, and C.L. said she did yesterday. Taylor then told C.L. that she did not do anything wrong, and she did a good thing by talking and telling someone. She also told C.L. she could always speak with the police, a teacher, or her mother, and assured her that her mother would not be upset.

Cross-examined about the length of the interview, which was eighty-three minutes, between 3:12 and 4:35 p.m., Taylor and Stio conceded that the guidelines suggested interviewing four-year-old children for only twenty-five minutes. However, they also said the guideline was not absolute, and their practice was to continue interviews for as long as the children were engaging in conversation. In this regard, Taylor testified that throughout the interview C.L. "was very engaged" and never lost interest.

After the interview concluded, Taylor, Stio, Kellogg, Musto, and Troche spoke with M.L. and advised her of C.L.'s disclosures. According to Stio, M.L. cried, was unable to speak, and broke out in hives. When she got her emotions under control and was able to speak, she said she did not understand how this could have happened in her home.

M.L. consented to C.L. being physically examined. No injuries or evidence of trauma were found during the examination. A small amount of fecal matter was found around C.L.'s anus, and she had some mild redness in her genital area. However, the doctor who examined her, Dr. Julia De Bellis, opined that the presence of fecal matter was merely indicative of poor hygiene, which was common in young children, and the genital redness was a nonspecific finding, meaning there could be many explanations for it.

De Bellis further opined that the absence of physical trauma neither confirmed nor denied the validity of C.L.'s allegations of abuse. She stated the child's genitalia could appear normal even if there had been some degree of penetration, and any superficial injuries could heal quickly without a scar or any deformity. She testified that in the majority of cases she has worked on involving alleged digital penetration of a child's vagina, she found no physical injury. She also stated that the use of lubricant would decrease the likelihood of injury.

At 5:40 that evening, Taylor and Musto took a statement from W.K. Meanwhile, Stio and Kellogg went to defendant's home in an attempt to locate him. Stio testified they arrived at defendant's home at approximately 6:00 p.m., defendant answered the door, and she advised him they had to speak with him in reference to his daughter being interviewed at the AHCH. Defendant and E.L. then

left with the officers, who first transported E.L. to the AHCH to be with M.L. and then transported defendant to the BCPO, where they placed him under arrest.

W.K. drove C.L. home, while M.L. drove with E.L. When they arrived home, W.K. told M.L. to give her a call if she needed anything. The next day M.L. texted W.K. and asked her to take the children out of the house, which W.K. did, taking them to J.M.'s house to play. W.K. worked for the family for another three or four days, after which she never saw C.L. again. She never discussed with M.L. what had happened.

At approximately 8:30 p.m. on October 7, 2010, Stio returned to defendant's home along with another detective. M.L. allowed the officers into the home and consented to their searching the home for the two ointments C.L. discussed during her interview. In a nightstand in defendant's bedroom, they found a bottle of KY lubricant. M.L. also gave them the ointment she used on C.L. The following day, Stio returned to defendant's home with a search warrant and retrieved a desktop computer and a laptop computer.

Yanal Bachok, a computer forensic analyst in the BCPO's computer crimes unit, testified as the State's expert in computer forensics. He testified that he reviewed hard drives from the two computers seized from defendant's home, and on his first preview found no child pornography in the "allocated" space. He explained

that information in "allocated" space has not been deleted by the user, whereas information in "unallocated" space consists of deleted information. He further explained that although information in unallocated space has been deleted, it has not been erased. Rather, the deleted information remains in the hard drive's unallocated space until it has been overwritten, even though the user cannot see it anymore.

Bachok testified he found no user data or personal information in the allocated space on the laptop computer, meaning "no pictures, no documents, no audio, like songs or video. Nothing that would indicate that this computer has been used practically at all[,]" which he said was "an unusual condition. . . ." To Bachok, this computer looked as though it had just arrived from the manufacturer because "[t]here was nothing except the operating system."[5] He therefore suspected the hard drive "must have gone through a process called system recovery[,]" which restores the hard drive "back to the factory image."

Bachok verified his suspicion by starting up the laptop computer after imaging the hard drive and replacing it into the laptop. When he turned the computer on with the hard drive replaced, and was able to crack the password ("Nurse"), he received

---

[5] Defendant testified that he purchased the laptop in 2008.

a message on the screen stating "Preparing your desktop," which indicated the system restore was in its final stages and the laptop was being prepared for an initial use. He testified that someone has to affirmatively access the computer and initiate the system restore process, and it appeared the system restore was initiated at 5:52 p.m. on October 7, 2010, i.e., just ten minutes after defendant's last phone call to M.L. and shortly before Stio arrived at his home at 6:00 p.m. Defendant denied he initiated the system restore. He testified that E.L. was using the laptop computer when the officers arrived, which he claimed was only a minute or two after his last phone call to M.L.

Bachok testified that when the system restore process occurs, the hard drive is restored to the factory image, and all of the allocated information is erased. However, this "doesn't mean gone"; rather, the information "moves to the unallocated space."

Bachok next performed a review of unallocated space on the two computer hard drives, using a special forensic program called NCASE. In particular, he looked for images (jpeg and gif), and "keywords" that relate to child pornography. He explained that finding a keyword on the computer means the word is in the computer's memory because the keyword had been "searched or looked for or existed as part of like an internet history or a document or it could be even a dictionary word."

24

In unallocated space on the laptop computer hard drive, Bachok found "hits" for the keywords "Lolita," "Preteen, "PTHC," which stands for Preteen Hardcore, "R@ygold," and "Underage." He also found hits for "Jenny Lays With Dog," "Asian Street Meat," "Dasha-Models," "Indexlolita," "Little Caprice," "Littleliana," "Little Virgins," "Nymphets," and "Teenburg." He found 152 "hits" for the keyword "Limewire," explaining that Limewire "is a peer-to-peer program for file sharing between computers" that is often used for sharing illegal content, such as child pornography. He also found numerous images of suspected child pornography, as well as images of defendant and his family, and "website banners" that included key words related to child pornography. The images were shown to the jury, with the child pornography separated from the family photos. Because of the system restore, however, Bachok was unable to recover the internet history for these items, the dates and times when the files were downloaded or viewed, where the photos were downloaded from, or the user profile associated with the files.

Regarding the desktop computer hard drive, Bachok testified that "[i]t looked like the computer has been used almost every day since it was purchased[,]" because there was "[a] lot of user information, whether it's pictures, documents, MP3 files, like audio, songs, videos and things like that[,]" in both the allocated

25

and unallocated space. He found no child pornography images on the desktop, but found many "hits" for keywords, mostly in unallocated space, including "Lolita" (4341 hits), "preteens" (320 hits), "PTHC" (14 hits), "Underage" (58 hits), "Teenburg" (27 hits), "Nymphets" (103 hits), and "Index Lolita" (68 hits). He also found 152 hits for "Limewire."

Finally, Bachok testified he found the program "Cyberscrub" installed on the desktop computer, and explained that Cyberscrub is advertised as a program that deletes your internet history. He further stated he found 10,089 hits for Cyberscrub on the laptop computer, indicating that Cyberscrub had also been installed on this computer, although it was removed to unallocated space during the system restore.

### C.L.'s Recantations

Defendant retained a private investigator, Lisa Reed, to interview C.L. Reed had prior experience working as a law enforcement officer in a sex crimes unit and was trained in interviewing children. She stated that four-year-old children generally have an eight-minute attention span, but also admitted "[y]ou interview them until you realize you've lost them or until you have no other questions."

Reed interviewed C.L. on November 30, 2010, with the interview lasting twenty-three minutes, between 2:29 and 2:52 p.m. A

videotape of that interview was shown to the jury. During the interview, C.L. mentioned that her brother saw her father in handcuffs. When asked why he was in handcuffs, C.L. responded that "somebody thought that daddy did a bad thing. . . . Like me and my dad, like did something." When asked "What'd you do?[,]" C.L. responded she had taken her clothes off in her parents' bed, with her father in it, but he had not asked her to do it, and he was wearing clothes at the time. Reed asked C.L. if she told "the ladies something that made them arrest your daddy?[,]" and C.L. responded she did not know "if he really got arrested."

Thereafter, in response to direct questions (e.g., "Did daddy ever touch your ah, peepka when you were laying in bed, in, in his bed?" and "Did you ever touch daddy's weenie?"), C.L. denied her father ever touched her peepka or put his finger in it, that she had ever seen or touched his winky/weenie, or seen anything come out of his winky, or that she sat on top of her father when she had no clothes on. She also denied ever telling anyone that any of those things happened. She said her father would clean her peepka in the shower, but he was wearing a bathing suit when he did so. C.L. also claimed that W.K. pulled down E.L.'s underwear in front of his friends, in order to embarrass him, but stated she never saw this happen, and her brother would tell Reed about it.

At trial, C.L. denied she told W.K. about things that happened

27

between her and her father. She also repeated what she told Reed about W.K. pulling down her brother's pants in order to embarrass him, adding that W.K. also hung her brother upside down. She also said she told her mother about this event, after which W.K. was no longer her babysitter.[6]

C.L. testified that she spoke to Taylor and told Taylor her father "didn't do anything." She denied that anybody ever touched her private parts, and said her father only did so in order to apply a Neosporin-type ointment. She also denied her father ever made her touch his winkie, touched her peepka, or touched his winkie to her body. She said she only told Taylor these things happened because W.K. told her to, which was the same reason she told Taylor that she and her father lay on the bed with no clothes on. She testified that she told Taylor only what W.K. told her to say, which was "[t]hat my dad touched me in a place that I wouldn't want to get touched[,]" and that she touched him.

C.L. claimed that W.K. pulled her into the mudroom, told her "to tell that my dad touched me in a place that I don't like to get touched[,]" and when she resisted W.K. told her "well, then you won't like what's going to happen." She did not know what W.K. was planning to do to her, but said W.K. had threatened to

---

[6] W.K. denied ever doing this to E.L.

stuff cheese down her brother's throat, and "[s]he would make me and my brother clean, top to bottom, the house."

When questioned whether she ever talked to Taylor about "winkie ointment," C.L. admitted she had and explained that "one night I walked in and he -- my dad screamed at me, and then I went back to my room. I cried, and then nothing happened after that." When questioned further, she said that when she walked into her parents' bedroom in the middle of the night, her father was lying on his side on his bed, wearing only a t-shirt and watching a movie on his laptop computer, and she saw him putting ointment on his winkie, which she described as appearing "like silk and gooey kind of." However, she immediately contradicted herself by saying she never saw him put the ointment on his body and that the ointment container was merely lying behind him on the bed.

C.L. testified she told her mother about this incident, and the incident in which W.K. pulled her into the mudroom and told her what to say, and also told her therapists about both incidents. She said she was sad that her father could not be home and she could not see him. She said that she loved her father and "he's a good dad[,]" and she wanted him to come home. She also knew that her mother wanted her father home because it was hard to be a single mom of two kids, and she knew that her grandfather (defendant's father), who lived with her, also wanted defendant

to come home.

C.L. testified her mother told her they would "try to get him home together[,]" but also that she was "the main part of this, and you're the one that will help get him home." Based on what her mother told her, C.L. believed her father would "be home soon," after her therapy was finished and they had a final court date, "like we are right now." Asked how she felt to be the main part of this, she responded, "Well, I feel really confident in myself because I know I can make my dad come home . . . [b]y telling the truth and not telling a lie to anybody." She said she was in the courtroom "to get my daddy home[,]" and believed the jurors were there "to make the decisions if my daddy can come home."

On cross-examination she responded "Yes" when asked: "Would you say anything you could, no matter whether it was true or not, to get your daddy to come home?" Following up, defense counsel asked if she "would lie to us to get your daddy to come home?[,]" and she responded "No." Thereafter, on redirect, she expressed her belief that because she testified her father had not touched her peepka and she had never touched his winkie, "[h]e's going to come home." When asked what she thought would happen if she said that her father touched her peepka, or he had her touch his winkie, she responded "[h]e's not going to come home[,]" and that would make her feel sad.

## The Defense

Defendant testified and denied committing the acts alleged in the indictment and any of the acts alleged in C.L.'s statement to Taylor.  He testified to the incident C.L. spoke of at trial, where C.L. walked in on him while he was masturbating in his bedroom, and to the incident C.L. spoke of with Reed, that is, his getting into the shower with C.L. while wearing shorts, in order to clean her up after toileting accidents.

Defendant presented character witnesses, who testified he had a reputation for truthfulness.  Defendant also contested whether C.L. had ever been sexually abused.  As to those issues, C.L.'s pediatrician, Dr. Kimberly Kinney, testified she reviewed C.L.'s medical records and found no evidence she suffered any trauma from sexual abuse.

Defendant also contested the validity of C.L.'s disclosures to W.K. by attacking W.K.'s credibility and claiming she influenced the child to accuse him of abuse.  He also attacked the validity of C.L.'s statements to Taylor based upon the length of the interview, the nature of Taylor's questioning, and the gap in the recording.

Dr. Phillip W. Esplin, an expert in forensic psychology, testified about the validity of C.L.'s statements to W.K.  Esplin testified that children between three and six years old "have

31

difficulty sorting out the origin of their belief . . . [s]o that they can become confused in terms of what they may have heard from somebody or what they may have overheard as opposed to what comes from their direct experience." They are also socialized to acquiesce and defer to adults, so they tend to answer a question even if they do not know the answer, and to change their answer if their initial answer is not accepted.

Esplin opined one must be wary that an adult might have influenced the child either by questioning the child, or having the child overhear the adult's conversations, including negative statements about the suspected perpetrator, or having the child observe the adult's demeanor, attitude, or concern, because "all those factors can influence what the child may say during that forensic interview." Esplin also opined that when questioning such young children, the interviewer must be careful that the child comprehends the basic rules of the interview (e.g., "If I ask you a question and you don't know the answer, don't guess."), and the interviewer should exercise caution when using option-posing questions (e.g., "were your clothes on, or off, or something else?"), because such questions "are very difficult for that age group to understand[,]" so sometimes the child will "just begin to guess and choose one of the alternatives."

Esplin testified that when interviewing children, the focus

should be on "invitational questions" (e.g., "tell me what happened[.]"). He stated that leading questions, also referred to as "tag questions," are permissible; however, they should not be the "focus" of the interview, and generally they should not be posed until later on in the interview, if necessary.

Esplin further testified that the recommended time for interviewing children between three and five years old is between fifteen and twenty-five minutes. If the interview exceeds this time-frame "[t]he risk is that the child may reach a point where they decide that they're going to tell you what you want to hear so they can get out of there." They will also lose focus, pay less attention, and sometimes give confusing answers. He stated that anyone interviewing a child should keep track of the time, and also observe whether the child is showing signs of fatigue.

Esplin acknowledged, however, there are individual differences between children, so each situation must be evaluated on a case-by-case basis. While he believed that forty minutes was the outside limit for an interview of a child between three and five years old, he conceded an interview of that length could continue, after a break, if the interview was productive.

Regarding breaks generally, Esplin opined that ideally an interview would continue uninterrupted. However, a child's request for a break should be respected. Esplin said it was a

33

judgment call as to whether a break should be taken in the event of a malfunction of the recording equipment, as there were numerous factors to consider, including the safety of the child and whether the malfunction occurred at a critical time.

Finally, Esplin testified with respect to the use of dolls in child interviews that on the one hand "there's some information that the use of the dolls increases some detail."  "At the same time, it increases the frequency of errors."  Also, with school age children, age six and up, the use of dolls tends "to lessen the amount of verbal memories you receive."  Ultimately, he said there have "been no studies to demonstrate that the use [of dolls] increases the yield of reliable information about what may have happened."  Thus, he would not use dolls, or diagrams, unless he had "exhausted every other avenue of getting verbal memories."

Defendant blamed his father-in-law, K.W. for the child pornography found on his laptop computer.[7]  Both defendant and K.W. testified that on two occasions when K.W. visited defendant's home, in 2003 and 2008, defendant discovered K.W. was using his computers to view child pornography and angrily confronted K.W. about it.  On both occasions defendant limited K.W.'s access to

_____

[7]  Bachok testified that K.W.'s last name had 285 hits on the desktop computer, and 271 hits on the laptop, which meant only that the name appeared somewhere on each computer, e.g., an email, an email address, or a document.

the computers and monitored K.W.'s internet history although after the second incident he never found any evidence that K.W. was accessing child pornography. In addition, K.W. promised defendant he would not access child pornography again, and gave defendant money to replace the computers.

Defendant testified that in 2003 he threw out the old computer and purchased a new one with money K.W. provided. Thereafter, in 2008, he used K.W.'s money to purchase the laptop computer, which was kept in the family room and "pretty much everyone used[;]" however, he did not discard the desktop computer, which was kept upstairs. Instead, he chose to run Cyberscrub on the desktop computer, in order to eliminate unwanted material while retaining everything else. Initially, he claimed to have run Cyberscrub in 2007 or 2008. However, when confronted with his purchase record, he conceded he did not purchase the program until 2010.

K.W. testified that he used defendant's computers to view child pornography and claimed he had "a sickness, an addiction" to child pornography. However, he testified he only viewed child pornography maybe once a month, or three times per week, and claimed he only began viewing it in 2006, and completely stopped viewing it in 2009. He denied having any preference for viewing any particular sexual acts or body parts, downloading any photos or emailing them, keeping a collection of child pornography, or

trading it with collectors, and using the program Lime Wire.[8]  He also said he never went to any particular website, and only accessed the child pornography through search engines.  He recalled some of the keywords found on the computers, and recalled viewing some of the photos recovered from the laptop computer's hard drive.

On the other hand, in 2011, K.W. denied to the Division that the child pornography belonged to him.  Moreover, on other occasions, he indicated he only accessed child pornography twice, once in the fall of 2003, and the second time in the fall of 2008.  He also claimed that in 2008 he viewed only Japanese comic book style drawings depicting people engaged in sexual activity with underage persons, but no pictures of live persons.

## II.

Defendant filed a motion to suppress C.L.'s statement to Taylor.  Following a N.J.R.E. 104 hearing, at which W.K., Stio, and Taylor testified, the court issued a written opinion, finding the statement trustworthy, notwithstanding the gap in the recording.  The court rejected defendant's argument that Taylor's questioning of C.L. was "inept, coercive and manipulative," stating:

> The court disagrees with defendant's analysis of Taylor's interview of C.L.  While she did employ leading questions, it is

---

[8]  Defendant also denied using Lime Wire.

apparent that such questions occurred only *after* the child made a disclosure, and that the leading questions were geared to clarify or to assist the child to specify the disclosure. The court finds the interview of . . . C.L., and her resulting statements were not the product of threats, bias, or misleading questions. To the contrary, the court is satisfied that C.L. was able to articulate the alleged sexual conduct without prompting or suggestive questioning; that she was able to describe specific events; that she did not use words or phrases 'beyond her years,' but demonstrated her naivety to the sexual acts portrayed; that she was able to identify with clarity the parts of her anatomy and defendant's anatomy involved in the acts; that she was able to recall events, both as to time and place, although not with time-specificity due to her age.

Therefore, based upon the totality of the circumstances, the court is satisfied that C.L.'s statement is trustworthy, and should therefore be admitted at trial, pursuant to [N.J.R.E. 803(c)(27)].

The fact that this court finds C.L.'s statement trustworthy for purposes of admissibility at trial in no way reflects upon whether or not the incidents actually occurred. Her statements are subject to cross-examination at trial, as well as Stio's notes regarding the gap and Taylor's method of questioning the child. Whether or not the incidents actually occurred, is reserved solely for the jury's providence.

On appeal, defendant contends in Point I that the court erred in admitting C.L.'s videotaped statement to Taylor. He argues the statement was untrustworthy because: (1) twenty crucial minutes of the statement, during which C.L. first made allegations of

sexual abuse, went unrecorded, and therefore there is no verbatim record of what questions Taylor asked or what statements she made to C.L., and no recording of the tone of Taylor's voice; (2) C.L.'s failure to make any abuse allegations in the first half of the statement, and her post-interview recantations of the sexual abuse allegations, indicate her statements to Taylor were fabrications; (3) the interview was excessively long for someone of C.L.'s young age; and (4) Taylor's denial of C.L.'s request to see her mother, just prior to using the anatomical dolls, "was clearly an abuse of Taylor's ability to reward or punish C.L. for the child's responses to Taylor's questions." Only a few of these arguments were raised before the trial judge.

Defendant further argues the court compounded the error by permitting the State to play the video twice on its direct case and during summation, and allowing the jury to watch the video for a fourth time during deliberations. Defendant claims this enabled the State to give undue weight to C.L.'s statement and effectively prevented the jury from considering her sworn trial testimony and other out-of-court statements denying defendant engaged in any improper conduct. Alternatively, for the first time on appeal, defendant argues that when the jury viewed the tape during deliberations, "[a]t a minimum," C.L.'s trial testimony and her interview with Reed should have been read back to the jury along

with her statement to Taylor.

"[I]n reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." State v. Kuropchak, 221 N.J. 368, 385 (2015) (citation omitted). Under that standard, "[c]onsiderable latitude is afforded a trial court in determining whether to admit evidence," and "an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" Id. at 385-86 (alteration in original) (citations omitted).

Our review of a trial court's decision on a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). As our Supreme Court has held:

> Appellate review of a motion judge's factual findings in a suppression hearing is highly deferential. We are obliged to uphold the motion judge's factual findings so long as sufficient credible evidence in the record supports those findings. Those factual findings are entitled to deference because the motion judge, unlike an appellate court, has the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy."
>
> [State v. Gonzales, 227 N.J. 77, 101 (2016) (citations omitted).]

We will "reverse only when the trial court's determination is 'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Gamble, 218 N.J. 412, 425 (2014) (citation omitted). However, we owe no deference to the trial court's legal conclusions or interpretations of the legal consequences flowing from established facts, and review questions of law de novo. State v. Watts, 223 N.J. 503, 516 (2015).

N.J.R.E. 803(c)(27) provides as follows:

> A statement by a child under the age of 12 relating to sexual misconduct committed with or against that child is admissible in a criminal . . . proceeding if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide the adverse party with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to [N.J.R.E.] 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse; provided that no child whose statement is to be offered in evidence pursuant to this rule shall be disqualified to be a witness in such proceeding by virtue of the requirements of [N.J.R.E.] 601.

Here, the court considered the evidence and relevant factors in determining that C.L.'s interview was sufficiently trustworthy to warrant admission under N.J.R.E. 803(c)(27), including the gap

in the recording and the other arguments defendant raised. See Idaho v. Wright, 497 U.S. 805, 821-22 (1990); State v. P.S., 202 N.J. 232, 248-54 (2010). On the evidence presented at the N.J.R.E. 104 hearing, we discern no reason to second-guess the court's factual findings, and defendant has not shown an abuse of discretion in the court's evidentiary ruling.

Regarding defendant's complaint about the number of times the video was played to the jury, the record reflects the video was played in full twice during the State's direct case, first during Stio's testimony, and second during Taylor's testimony. The court inquired as to whether defense counsel had any objection to the video being played twice, and defense counsel answered he did not.

Thereafter, defense counsel used the video extensively when cross-examining Stio and Taylor, as he was critical of the length of the interview, Taylor's demeanor, her statements to C.L., the nature of her questions, C.L.'s behavior during the interview, and Taylor's denial of C.L.'s request to see her mother.[9]

The court overruled defense counsel's objection to the prosecutor using two, two-minute clips of the video during summation. Defense counsel did not use the video during his

---

[9] This string of citations is not meant to reflect a complete list of times defense counsel played the videos during cross-examination.

A-5783-13T1

summation; however, in attacking Taylor's credibility, he reviewed the interview in detail with the jury, highlighting particular questions and particular portions of the interview he argued were problematic.

During deliberations, the jury requested a playback of a portion of the video. The court discussed the request and its proposed response with counsel. During that discussion, defense counsel did not object to the jury watching the video, or request that the court require the jury to have a playback or readback of any other testimony. However, counsel objected to the jury having the transcript of the video as an aid.

Thereafter, the jury was brought to the courtroom, and the judge inquired as to which video the jury wanted to watch, "the Cora Taylor video or the Lisa Reed video," to which the jury foreperson responded the "Cora Taylor video[.]" The court then inquired: "[I]s it the entire video that you want to see[,]" and the foreperson responded: "We don't need the beginning, we would like it maybe four or five minutes prior to when the tape goes out and then, obviously we don't want to watch a blank tape for [twenty] minutes, but then the end of the tape[.]" Finally, jurors responded affirmatively when the court inquired whether the foreperson's response was "everybody's choice[.]"

The court then replayed the portion of the video the jury requested, in open court, subject to the court's supervision. After the playback, the court instructed the jury as follows:

> Members of the jury, you've requested a play back of the testimony of [C.L.] The recorded testimony has been played for you. In your deliberations you're instructed to consider all the evidence presented and not give undue weight to the testimony you heard and seen played back and now you can go back into the jury room and continue deliberations. Thank you.

The jury then deliberated for another hour, at which time the court adjourned for the day. The next day the jury resumed its deliberations. The jury reached its verdict, which the court accepted, and the court adjourned at 1:04 p.m.

Since defendant did not object to the jury watching the video twice during trial, or to the jury watching a portion of the video for a third time during deliberations, we review those issues for plain error, that is, whether the error was "clearly capable of producing an unjust result[.]" R. 2:10-2; State v. Weston, 222 N.J. 277, 294 (2015). Defendant bears the burden of proving plain error. Weston, 222 N.J. at 295.

Under the unique circumstances of this case, where there was a twenty-minute break in the video due to the recorder malfunctioning, we find no plain error in the court's permitting the jury to watch the video during the testimony of both Stio and

43

Taylor. Defendant's failure to object to this procedure, and defense counsel's extensive use of the video during cross-examination, indicates his belief that repetition and close analysis of the video would be helpful, not harmful, to defendant's case, as it would reveal misconduct or mistakes on the investigators' part.

There also was no error in the court allowing the prosecutor to use two short clips from the video during summation. The prosecutor used those clips to focus the jury's attention on C.L.'s statements that were supportive of counts in the indictment alleging specific acts of sexual abuse. Thus, there was nothing inappropriate in the prosecutor's use of the video. See State v. R.B., 183 N.J. 308, 330 (2005) (stating that summations should be limited to discussion of the evidence); State v. C.H., 264 N.J. Super. 112, 134 (App. Div. 1993) (finding no error in the prosecutor's commenting on evidence that showed sexual assault by penetration).

Regarding the jury's review of the video during deliberations, the law provides that videotaped pretrial statements of witnesses are a special type of exhibit, akin to trial testimony. Burr, 195 N.J. at 134. Therefore, they "require[] special consideration by a court overseeing a trial that has reached the deliberation stage." Weston, 222 N.J. at

44

289.

"[T]here is no per se rule against the replay of video recordings during jury deliberations and . . . the decision to replay a recording is vested in the discretion of the trial judge." State v. A.R., 213 N.J. 542, 560 (2013). Indeed, absent some unusual circumstances, a request by the jury to replay a videotaped statement should be granted, State v. Miller, 205 N.J. 109, 119-20 (2011), and the court "should honor a jury's specific request to hear only limited parts" of a video. Id. at 123 (noting that when a limited playback of testimony is requested, court should ensure that playback includes relevant direct and cross-examination).

Nevertheless, certain procedures should be followed. Specifically, in order to avoid the jury overemphasizing a particular segment of a video, or viewing a video out of context, "a trial court should not permit a jury to have unrestricted access during deliberations to the videotaped pretrial statements of witnesses." Weston, 222 N.J. at 289, 292-93. Rather, any "replay of a videotaped statement during deliberations should only be conducted upon the jury's request, and after a determination that the jury's concerns cannot be addressed with a readback of testimony." Id. at 293. In making that determination, the court also should consider whether testimony from additional witnesses

should be replayed in order to provide context. <u>A.R.</u>, 213 N.J. at 560. Moreover, any replay "must be conducted in open court, under the careful supervision of the trial judge." <u>Weston</u>, 222 N.J. at 293. Finally, "at the time the testimony is repeated, judges should instruct jurors to consider all of the evidence presented and not give undue weight to the testimony played back." <u>Miller</u>, 205 N.J. at 109.

Here, the court complied with the governing law to the extent that it did not permit a playback of C.L.'s statement except upon the jury's request, and it required the playback occur in open court. However, the court did not inquire of the jury whether it would like a playback or read back of any trial testimony from C.L. or another witness.

Defendant argues it was plain error to not sua sponte provide the jury with C.L.'s trial testimony and her interview with Reed, along with her statement to Taylor. However, the above-cited case law did not require such an action, defendant did not request it, and under the circumstances of this case, we perceive no error in the failure to inquire about a playback or read back of additional testimony. <u>See</u> <u>Weston</u>, 222 N.J. at 294-300 (engaging in case-specific inquiry when considering whether trial court committed plain error in allowing jury unsupervised access to witnesses' videotaped pretrial statements).

C.L.'s statement to Taylor accused defendant of sexual abuse. Therefore, a read back of C.L.'s trial testimony or a playback of her interview with Reed would not have provided the jury with the information it requested.

Furthermore, the defense was that Taylor pressured C.L. to disclose abuse through her conduct of the interview. The defense also argued that C.L. was of such a young age she could not stay focused during an interview exceeding twenty-five minutes. To the extent the jury was considering those arguments, none of that information could be gleaned from a read back of the transcript of C.L.'s videotaped statement to Taylor, nor from a replay of C.L.'s trial testimony or her statement to Reed. Cf., A.R., 213 N.J. at 561 (finding no error in allowing the jury unsupervised access to video of witnesses' statements where defense counsel invited the error by encouraging the jury to review video recorded statements and urged the court to submit statements to the jury during deliberations).

We conclude there was no abuse of discretion in the court's admission of C.L.'s pretrial statement to Taylor under N.J.R.E. 803(c)(27); no plain error in the court's allowing the video to be played twice during trial; no error in the prosecutor's limited use of the video during summation; and no plain error in the court's handling of the jury's request for a replay of a portion

47

of the video during its deliberations.

                                    III.

Defendant contends in Point II that the court erred in barring audio recordings made by M.L., and exclusion of the recordings violated his right to due process and his right to confrontation. We disagree.

The court held a N.J.R.E. 104 hearing to determine the admissibility of various audio recordings made by M.L.  M.L. testified that the Family court ordered her and her children to attend therapy sessions at the AHCH.  On July 5, 2012, she recorded a therapy session, where C.L. was also present.  She gave the recording to defendant, who copied it onto a CD and prepared a transcript.

M.L. also testified she recorded a therapy session on December 27, 2012, where C.L. was also present.  She also recorded ten or fifteen other therapy sessions, as well as her conversation with Anthony D'Urso, Ph. D. in December 2011.  M.L. did not advise the individuals that she was recording them.  She gave the recordings to defendant.  At some point in 2012, M.L. advised the Family court attorneys that she made the recordings, and gave them the audiotapes.  She testified she made the recordings because she did not feel comfortable with how the therapy was progressing and believed the therapy was not being accurately reported to the

court.

M.L. testified that on several occasions at home, C.L. said that W.K. told her what to say about defendant, although C.L. did not give any details about what W.K. instructed her to say. C.L. first made such a statement about two months after defendant's arrest. A few months later, C.L. told M.L. about the incident when she walked in on defendant masturbating.

Based upon C.L.'s statements to her, as well as defendant having passed a polygraph and a psychosexual test, M.L. believed he was innocent, and W.K. was responsible for C.L.'s fabricated accusations of sexual abuse. M.L. stated she did not speak with C.L. about what happened since the therapy session recorded on December 27, 2012. The only things C.L. said to her since then was that she missed her father and wanted him to come home.

In its oral and written opinions, the court set forth its understanding that defendant's "application involves the interplay between the various statutory privileges which protect the disclosure of therapeutic records . . . particularly in a Title Nine case, against a defendant's Constitutional Rights of Due Process insured by the Fifth Amendment, and his Sixth Amendment Right of Confrontation in criminal proceedings."

Reviewing the governing law and weighing the legal issues, the court concluded that M.L. "had no authority to waive C.L.'s

49

victim counselor privilege and disclose the conversations between the child and her therapist to third persons" because she had an interest in the outcome of the litigation. Specifically, M.L. believed W.K. told C.L. to fabricate the allegations of sexual abuse, and "[s]he [was] convinced defendant [was] innocent of all charges and want[ed] defendant reunited with her and the children." The court further held that, even if M.L. had the right to waive C.L.'s privilege, the overriding policy reasons which established the confidentiality of Title Nine proceedings would defeat such a waiver, which was not in the best interests of the child.

Nevertheless, in considering defendant's rights to due process and confrontation, the court held he could admit some evidence of C.L.'s recantations during the July and December 2012 therapy sessions, but only through therapy progress notes, which was "a less intrusive avenue than playing the recorded therapy sessions. . . ." Thus, the court issued a protective order regarding all of M.L.'s recordings, such that they would remain under seal with the court and defendant would not be permitted to use them at trial, or take testimony from the AHCH therapists. However, the court permitted defendant to present evidence of C.L.'s alleged recantations of the sexual abuse allegations during therapy through information from therapy progress reports.

In addition, the court ruled that a thirty-two second, non-

confidential recording M.L. made of a conversation with C.L., either immediately before or after a therapy session, could be used at trial. The court noted that during this conversation, C.L. could be heard crying while telling her mother she knew about the recorder in her mother's pocket.

After issuing this ruling, the court held another hearing on these issues on September 9, 2013, at which it addressed how C.L.'s alleged recantations could be introduced into evidence at trial, i.e., either through a stipulation between the parties or limited testimony from a therapist. Thereafter, in a September 25, 2013 order, the court memorialized its above rulings and additionally held that the therapy progress reports themselves could not be admitted into evidence. The court also allowed for reconsideration of its rulings based upon issues that might arise at trial.

The court later issued a supplemental opinion, detailing the contents of four therapy progress reports. In addition, finding there were no therapy progress reports for the July 5 and December 27, 2012, therapy sessions, the court ruled that defendant could introduce information about C.L.'s recantations during those sessions through testimony of the therapists in attendance, and if those therapists were unavailable or denied any recantations occurred, then defendant could renew his request to present M.L.'s recordings to the jury.

At trial, C.L. testified on both direct and cross-examination that she told both her mother and therapists that W.K. coerced her into making the abuse allegations. Moreover, on cross-examination, defense counsel specifically asked C.L. about her statements at the July and December 2012 therapy sessions. Thereafter, defense counsel did not call M.L. or any therapists to testify, or request admission of any of M.L.'s recordings or therapy progress notes.

On defendant's motion for a new trial, he argued the court erred in excluding M.L.'s recordings of the therapy sessions. In denying the motion, the court noted the jury heard C.L.'s recantations through her trial testimony, and M.L.'s recordings of the therapy sessions would have been of little value to defendant in light of the recording M.L. made of her conversation with C.L., in which C.L. indicated she knew M.L. was recording the conversation.

Both the Federal and State constitutions protect a defendant's rights to due process and to confront the witnesses against him. U.S. Const. amends. V, VI, XIV; N.J. Const. art. 1, ¶¶ 1, 10; State v. Garron, 177 N.J. 147, 168-69 (2003). Notably, however, the right of confrontation is not absolute. Sometimes it must give way to accommodate competing interests, such as rules of evidence and procedure, so long as application of those rules

does not deprive a defendant of his right to a fair trial. <u>Chambers v. Mississippi</u>, 410 U.S. 284, 295 (1973); <u>Garron</u>, 177 N.J. at 169-72.

Here, the interests competing with defendant's rights of due process and confrontation are the statutory confidentiality of Title Nine proceedings, as well as the privilege that protects victim-counselor therapy sessions. Specifically, under N.J.S.A. 9:6-8.10a, Division records are maintained subject to a "strict confidentiality requirement" that serves as "a procedural safeguard to protect victim children from unnecessary disclosure of his/her abuse which may cause the child further guilt, vulnerability or humiliation." <u>N.J. Div. of Youth & Family Servs. v. J.C.</u>, 399 N.J. Super. 444, 447 (Ch. Div. 2006).

There are limited exceptions to the confidentiality requirement, including that records may be produced to a court "upon its finding that access to such records may be necessary for determination of an issue before it[.]" N.J.S.A. 9:6-8.10a(b)(6). Under no circumstances, however, shall the Division "release any information that would likely endanger the life, safety, or physical or emotional well-being of a child . . . ." N.J.S.A. 9:6-8.10a. The statute states, in pertinent part:

> a. <u>All records of child abuse reports . . . all information obtained by the Department of Children and Families in</u>

investigating such reports . . . and all
reports of findings forwarded to the child
abuse registry . . . shall be kept
confidential and may be disclosed only under
the circumstances expressly authorized under
subsections b., c., d., e., f., and g. herein.
The department shall disclose information . .
. that is relevant to the purpose for which
the information is required, provided,
however, that nothing may be disclosed which
would likely endanger the life, safety, or
physical or emotional well-being of a child
or the life or safety of any other person or
which may compromise the integrity of a
department investigation or a civil or
criminal investigation or judicial
proceeding. . . .

b. The department may and upon written
request, shall release the records and reports
referred to in subsection a., or parts
thereof, . . . to:

. . . .

(6) A court . . . upon its finding that access
to such records may be necessary for
determination of an issue before it, and such
records may be disclosed by the court . . .
in whole or in part to the law guardian,
attorney, or other appropriate person upon a
finding that such further disclosure is
necessary for determination of an issue before
the court . . . .;

. . . .

Any individual, . . . court . . . or other
entity which receives from the department the
records and reports referred to in subsection
a., shall keep the records and reports, or
parts thereof, confidential and shall not
disclose the records and reports or parts
thereof except as authorized by law.

. . . .

> The department shall not release any information that would likely endanger the life, safety, or physical or emotional well-being of a child or the life or safety of any other person.
>
> [N.J.S.A. 9:6-8.10a (emphasis added).]

See also N.J.R.E. 515 (prohibiting disclosure of official State information "(a) if disclosure is forbidden by or pursuant to any Act . . . of this State, or (b) if the judge finds that disclosure of the information in the action will be harmful to the interests of the public").

In addition, N.J.S.A. 2A:84A-22.13 and N.J.R.E. 517 codify the victim-counselor privilege, such that "it is the public policy of this State to extend a testimonial privilege encompassing the contents of communications with a victim counselor and to render immune from discovery or legal process the records of these communications maintained by the counselor." A person may waive a privilege they hold. N.J.S.A. 2A:84A-29; N.J.R.E. 530. However, a parent's ability to waive the victim-counselor privilege held by their child is limited under N.J.S.A. 2A:84A-22.15 and N.J.R.E. 517(1), which set forth that:

> In any instance where the juvenile is, in the opinion of the judge, incapable of knowing consent, the parent or guardian of the juvenile may waive the privilege on behalf of the juvenile, provided that the parent or

> guardian is not the defendant and does not have a relationship with the defendant such that he has an interest in the outcome of the proceeding.
>
> [(Emphasis added).]

As a general rule, evidentiary privileges are to be narrowly construed. <u>State v. Szemple</u>, 135 N.J. 406, 413 (1994). Since they may undermine the administration of justice, "they are accepted only to the extent that they outweigh the public interest in the search for truth." <u>Id.</u> at 413-14.

In terms of case law, most relevant are <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39 (1987), and <u>State v. L.J.P.</u>, 270 N.J. Super. 429 (App. Div. 1994). In <u>Ritchie</u>, 480 U.S. at 54, the Court held the State did not violate the Sixth Amendment's Confrontation Clause by withholding a child protective services file, where defense counsel was able to cross-examine his accuser. <u>See also</u> <u>State v. Nyhammer</u>, 197 N.J. 383, 411-14 (2009) (finding no Confrontation Clause violation in admitting child sex abuse victim's statement to police where victim testified at trial and was subject to cross-examination). However, the Court concluded that in order to protect a defendant's due process rights, it may be necessary for a court to review such protective services records in camera, and order that any material information be disclosed. <u>Ritchie</u>, 480 U.S. at 56-60.

A-5783-13T1

Similarly, in L.J.P., 270 N.J. Super. at 436-38, the defendant appealed from his conviction of sexual assault and endangering the welfare of a child, arguing the trial court erred in finding the psychologist-patient privilege prevented him from introducing evidence, contained in Division reports already in his possession, that the child victim had recanted her allegations of sexual abuse during a conversation with her psychologist.

Considering the issue, we noted that the psychologist-patient privilege may be defeated if necessary to protect a defendant's rights to a fair trial and to confront the witnesses against him. Id. at 439-40. However, in order to pierce the privilege, the defendant must show: (1) a legitimate need for the protected information; (2) that the information is relevant and material to an issue before the court; and (3) no less intrusive source for the information exists. Id. at 440.

We also noted that at trial a witness testified to the victim's recantation, and the victim was also cross-examined about the recantation. However, the victim dismissed the recantation "as the product of coercion and misguided hopes for a reunified family." Id. at 442. Thus, we found the recantation allegedly contained in Division reports "was not otherwise available to the defense[,]" and its exclusion could not be viewed as harmless error. Ibid. Accordingly, we reversed and remanded for a new

trial, id. at 444, stating: "[T]he defendant's legitimate need for critical evidence and his right to confront his accuser with her repudiation of her allegations was far more compelling than the interests of confidentiality."  Id. at 443.

The present case is significantly different than Ritchie and L.J.P.  Unlike in those cases, defendant did not seek Division records in a manner permissible under the law, specifically N.J.S.A. 9:6-8.10a(b)(6).  See N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 637-38 (App. Div. 2010) ("[T]he mechanism employed by our Legislature to preserve the confidentiality of [the Division's] records and protect a victim's privacy interests is to require judicial review of a party's written request of the need for disclosure.").  Instead, M.L. surreptitiously recorded therapy sessions and provided the recordings to her attorney and defendant, who then provided them to his attorney, all in contravention of the law.  These recordings only came to the criminal court's attention when defendant sought additional discovery and to admit the recordings into evidence at trial.

We cannot condone or encourage M.L.'s behavior, as it violates the public policy set forth in the statutes and evidentiary rules previously discussed.  Moreover, given M.L.'s relationship to defendant and her belief that he was innocent of the charges, the

court correctly ruled she could not waive C.L.'s victim-counselor privilege. Therefore, in its rulings, the court reasonably attempted to avoid introduction of the surreptitious recordings of therapy sessions and instead relied solely on Division records or testimony from the therapists.

Ultimately, however, no such evidence was necessary because, unlike in L.J.P., C.L. recanted her allegations of abuse at trial. She also testified that W.K. coerced her into making allegations of abuse and told this to her therapists in the July and December 2012, therapy sessions, with defense counsel questioning her about her statements during those therapy sessions.

Therefore, unlike in L.J.P., defendant did not need M.L.'s recordings at trial. Through C.L.'s testimony, he got what he wanted -- C.L.'s multiple recantations presented to the jury, along with her allegation that W.K. was the source of her statements to Taylor.[10]

In sum, the court provided defendant with relevant information from the Division's records, and defendant had a full

---

[10] Defendant argues he should have been permitted to use the recorded therapy sessions "to confront the State's witnesses." However, the only State's witness he could have confronted was C.L., in order to defuse her allegations of sexual abuse. No other State's witnesses appeared on the recordings or had any connection to C.L. at the time the recordings were made in 2012, two years after defendant's arrest.

and fair opportunity to cross-examine C.L. and explore the recantations with her, even without the recordings. Therefore, there was no violation of his rights to due process and confrontation. Ritchie, 480 U.S. at 54, 56-60; Nyhammer, 197 N.J. at 411-14. Moreover, under the circumstances presented, C.L.'s prior consistent statements to her therapists would not have been admissible under the Rules of Evidence. See N.J.R.E. 607; N.J.R.E. 803(a)(2); Neno v. Clinton, 167 N.J. 573, 580 (2001).

Finally, as the court cogently noted on defendant's post-trial motion, there were risks associated with introduction of the therapy recordings at trial. Specifically, if defendant had renewed his request for introduction of the July 5 and December 27, 2012 recordings, then the prosecution likely would have sought introduction of the recording of C.L.'s conversation with M.L., in which C.L. tearfully told her mother she knew she was being recorded. Introduction of that mother-daughter conversation would have seriously diluted the value of the July 5 and December 27, 2012 recordings, and supported the State's argument that C.L.'s family influenced her to recant her accusations. Indeed, that strategic risk-benefit analysis is the most likely explanation as to why, once C.L. recanted at trial, defense counsel did not renew his motion to introduce the recordings, as the court permitted him to do.

As for the recordings of M.L.'s own therapy sessions, which defendant argues for the first time on appeal should have been ruled admissible at trial, defendant has made no showing those recordings would have affected the outcome of the case. R. 2:10-2. Accordingly, we find no abuse of discretion in the court's evidentiary ruling with respect to M.L.'s surreptitious recordings of confidential therapy sessions.

IV.

Defendant contends in Point III that the court erred in denying his motion for a mistrial or a continuance upon learning the State did not produce discovery from W.K.'s cellphone until after trial began, since the cellphone contained significant impeachment information about W.K.

As set forth in greater detail below, defendant did not move for a mistrial or a continuance based on late discovery of the information found on W.K.'s cellphone. Rather, he moved only for admission of certain photos and text messages exchanged between W.K. and her boyfriend, which the court found irrelevant and therefore inadmissible under N.J.R.E. 401.

At trial, the prosecutor belatedly produced digital discovery of the contents of W.K.'s cellphone. The court held a N.J.R.E. 104 hearing to determine whether evidence of "sexting" between W.K. and her boyfriend was admissible. At the hearing, W.K.

testified that she used the cellphone while working for defendant's family, and gave it to the police for analysis on October 8, 2010.

W.K. testified that on September 29 and 30, 2010, her then-boyfriend sent her three photos of his penis, including two with semen on it. Also on September 30, 2010, she sent her boyfriend a photo of herself posing in underwear in defendant's bathroom. She explained she took the photo while in the bathroom, with the door locked. The cellphone also contained other texted photographs and W.K. explained the messages were a form of entertainment for them.

W.K. testified that her cellphone was always in her pocket or her purse, and she knew of only one occasion when E.L. accessed it in order to answer a call from his father when W.K. had left the children in the car for two minutes while she dropped off some insurance documents. However, that incident occurred in the summer of 2010, before the photos at issue were taken.

In terms of accessing the cellphone, W.K. testified that an incoming phone call could be answered while the cellphone was locked by simply pressing the green headphone button. However, in order to access the entire phone, the user had to press both the send button and the star button at the same time. If the cellphone was unlocked in that manner, the text messages could then be accessed by opening the menu and selecting messages. To

her knowledge, neither C.L. nor E.L. had ever seen the photos at issue. She never showed them the photos, and never saw them looking at the photos.

The court barred the photos and text messages from W.K.'s cellphone under N.J.R.E. 401 because there was no evidence that C.L. ever saw them and nothing showing the photos and text messages were relevant to W.K.'s motives. However, the court permitted defendant to renew his application if other evidence came to light that made this information relevant.

When trial resumed, defense counsel questioned W.K. about text messages that showed she and her boyfriend were arguing on October 6, 2010, and she needed money for a deposit on a new apartment. Counsel also suggested that W.K.'s nanny job was in jeopardy, although she denied knowing it was. Thereafter, defense counsel renewed his request to admit the photos and text messages. Counsel argued the photos were relevant to establish W.K.'s motive to coerce C.L. into accusing defendant of sexual abuse because W.K. needed money and was afraid of losing her job. The court denied the motion under N.J.R.E. 401, for the same reasons it previously expressed.

Defendant raised this evidentiary issue on his post-trial motion. In denying the motion, the court declined to address the contents of W.K.'s cellphone, other than to note the "issue was

fully developed at a [N.J.R.E.] 104 hearing."

As previously discussed, we review evidentiary rulings for an abuse of discretion. <u>Kuropchak</u>, 221 N.J. at 385. We review motions for a mistrial or a continuance abuse of discretion. <u>State v. Smith</u>, 224 N.J. 36, 47 (2016).

Whether a mistrial is required will depend upon "the unique circumstances of the case." <u>Ibid.</u> If there is a reasonable alternative to a mistrial, such as "a curative instruction, a short adjournment or continuance, or some other remedy," then granting a mistrial would constitute an abuse of discretion. <u>Ibid.</u>

Depending upon the facts of the case, late discovery may form the basis for grant of a continuance or a mistrial.

> Late discovery can cause unfair surprise and raise due process concerns. When a party fails to comply with its obligations, the discovery rule expressly states that the court may "grant a continuance or delay during trial" or "enter such other order as it deems appropriate." A court's failure to take appropriate action to remedy a discovery violation can implicate the defendant's right to a fair trial.
>
> [<u>Id.</u> at 48 (citations omitted).]

Here, because there was no basis for concluding that C.L. ever saw the photos on W.K.'s cellphone, the court did not err in concluding they were irrelevant under N.J.R.E. 401 and not

exculpatory of defendant. Moreover, the photos did not depict the sexual acts C.L. alleged defendant committed during her interview with Taylor. Thus, there was nothing tying the photos on M.L.'s cellphone to C.L.'s disclosures of sexual abuse. See N.J.R.E. 401 ("'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action."); Burr, 195 N.J. at 126-27.

The photos were produced to defendant after C.L. testified. However, C.L. never mentioned any photos in her pretrial statements or trial testimony. Had defendant wanted to explore the photos issue with C.L., he could have requested that she testify at the N.J.R.E. 104 hearing, but did not do so.

Also contrary to defendant's argument, the photos did not constitute impeachment evidence with respect to W.K. because they did not constitute extrinsic evidence relevant to the issue of her credibility. N.J.R.E. 607; State v. Hockett, 443 N.J. Super. 605, 615-16 (App. Div. 2016). Introduction of the photos would have served only to distract the jury from the issues presented, that is, whether defendant committed the criminal acts alleged in the indictment, by presenting it with salacious details of W.K.'s consensual, adult sexual relationship with her boyfriend, none of which was known to C.L. Accordingly, we find no abuse of discretion in the court's evidentiary ruling, excluding the photos

and text messages from W.K.'s cellphone, and thus no plain error in the court not sua sponte granting a mistrial or a continuance based upon the State's late production of discovery.

V.

Defendant contends for the first time on appeal in Point IV that the court erred in failing to instruct the jurors fully and adequately concerning their avoiding information from outside of the courtroom and voir dire the jurors upon their returning to the courtroom for the trial more than one month after the jury had been selected. This contention lacks merit.

During jury selection in December 2013, prospective jurors were asked whether they had any knowledge of the case or anyone involved in the case. The court also admonished prospective jurors to not discuss the case with anyone and to not do any research regarding the case. Once the jury was empaneled, the court gave a more detailed instruction, stating:

> It is extremely important that you do not discuss the case amongst yourselves. You don't discuss it at home with your families or friends. Don't go online. Don't use any Internet sites or . . . do any research of us, of the defendant, of the attorneys. And, . . . again, . . . don't go on any online sites to look for any of us, and particularly the three of us -- the attorneys and myself and the defendant, or don't discuss the law or try to find out what the law is all about or the facts, anything like that.

And the reason I say that is obvious. You haven't heard . . . anything yet. But, also, understand that if there's any outside influence it will taint this trial completely.

And, . . . unfortunately it's happened before where we've been through a trial two or three weeks and somebody -- one of the members of the jury did some outside research or researched about . . . information about one of the parties and that got circulated and everybody wasted their time and we had to start all over. Not with that jury, because that jury had to be discharged. Not happy because they had to spend time out of their lives.

So, it is critically important that . . . your deliberations are based solely on what happens inside this Courtroom, without any interference from anybody. And don't discuss, as I said, the case with family or friends. You really don't know anything. What you have are only allegations. You know nothing else about that.

In time you will hear all the facts. You'll hear argument of counsel. You'll be instructed on the law from me and then you guys can talk amongst yourselves.

Compare with Model Jury Charges (Criminal), "Preliminary Instructions to the Jury" (May 12, 2014).

Trial reconvened in January 2014. Throughout the trial the court admonished the jurors to avoid outside information about the case, including media coverage and independent research or discussions with other jurors or family members or friends. In the final charge, the court also instructed the jury that its

67

verdict must be based solely upon the evidence produced at trial.

Here, there is no basis whatsoever to conclude the jury was tainted by outside influences. We must presume that the jurors followed the court's instructions to avoid outside sources of information, State v. Ross, 218 N.J. 130, 152 (2014) because there is nothing in the record suggesting otherwise. Defendant was arrested in 2010, and the trial did not occur until 2014. Defendant produced no evidence this trial received extensive news coverage or that the jury was tainted by such coverage.

Moreover, the jurors in this case were diligent about their obligations. In another instance, they advised the court of a juror's misconduct (prematurely discussing his belief as to defendant's guilt or innocence), which resulted in that juror being excused. Therefore, it is reasonable to conclude the jurors also would have informed the court if it appeared a juror was tainted by outside information. We find no error, let alone plain error in the court's failure to sua sponte voir dire the jury regarding that issue.

## VI.

Defendant contends in Point V that the court erred in denying his motion to sever the sexual assault charges (counts one through six) from the child pornography and tampering/attempted destruction of evidence charges (counts seven and eight). Before

trial, he moved to sever counts seven and eight from the rest of the indictment. In a written opinion, the court denied the motion, stating:

> In this case, the Cofield[11] factors weigh in favor of the State such that the child pornography and destruction of evidence charges should not be severed from the sexual assault charges.
>
> Defendant argues that the sexual assault charges have nothing in common, either in fact or by way of proof, with the child pornography and destruction of evidence charges. The court disagrees, as these allegations are intertwined and there is a sufficient nexus to each other to justify joinder. [State v. Morton, 155 N.J. 383, 451 (1998); State v. Chenique-Puey, 145 N.J. 334 (1996)]. C.L. stated that defendant was "texting and watching TV" while performing the alleged sexual conduct. The two separate charges are similar in kind to each other and occurred within a reasonably close time from each other. Moreover, the alleged destruction of evidence demonstrates defendant's state of mind and intent relative to any charges pertaining to deviant sexual conduct. While the evidence of one crime vis a vis the other crime is prejudicial, such prejudice does not outweigh its probative value.
>
> The court also agrees with the State's position that the evidence between the two allegations of sexual assault and child pornography/destruction of evidence is "intrinsic" to each other. As set forth in [State v. Rose, 206 N.J. 141, 181-82 (2011) (citing United State v. Green, 617 F.3d 233 (3d Cir. 2010)),] evidence which is intrinsically intertwined with the other crime

---

[11] State v. Cofield, 127 N.J. 328 (1992).

charged, provides a background to the events, or "completes the story" is such intrinsic evidence.

In another pretrial motion, defendant renewed his request for severance, which the court denied for the reasons previously stated. During trial, defendant again moved for severance of the child pornography charges, and the court denied the motion for the reasons previously stated, also noting C.L.'s trial testimony that she observed defendant masturbating while watching something on the laptop computer.

Rule 3:7-6 allows for two or more offenses to be charged together in the same indictment "if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan." Under Rule 3:15-1 (emphasis added):

> (a) Permissible Joinder. The court may order 2 or more indictments . . . tried together if the offenses . . . could have been joined in a single indictment or accusation. . . .

> (b) Mandatory Joinder. Except as provided by [Rule] 3:15-2(b), a defendant shall not be subject to separate trials for multiple criminal offenses based on the same conduct or arising from the same episode, if such offenses are known to the appropriate prosecuting officer at the time of the commencement of the first trial and are within the jurisdiction and venue of a single court.

A-5783-13T1

Finally, under Rule 3:15-2(b), if for any "reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses . . . in an indictment . . . the court may order an election or separate trials of counts[.]"

We review a court's ruling on a severance motion for abuse of discretion. Chenique-Puey, 145 N.J. at 341. In ruling on a motion to sever, the court should consider the potential harm to defendant, as well as the need for judicial economy and expediency. Coruzzi, 189 N.J. Super. at 297-98. The key to determining whether joinder is prejudicial to a defendant is whether, if the crimes were tried separately, evidence of the severed offenses would be admissible under N.J.R.E. 404(b) in trial of the remaining charges. Chenique-Puey, 145 N.J. at 341. "If the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" Ibid. (quoting Coruzzi, 189 N.J. Super. at 299).

N.J.R.E. 404(b) provides, in pertinent part, that

> evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

A-5783-13T1

A four-pronged test is used to determine the admissibility of evidence under the rule:

> 1.   The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2.   It must be similar in kind and reasonably close in time to the offense charged;
>
> 3.   The evidence of the other crime must be clear and convincing; and
>
> 4.   The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Cofield, 127 N.J. at 338 (quoting Abraham P. Ordover, Balancing the Presumption of Guilt and Innocence: Rules 404(b), 608(b), and 609(a), 38 Emory L.J. 135, 160 (1989)).]

The second prong of the test is not found in N.J.R.E. 404(b). Therefore, it "need not receive universal application in Rule 404(b) disputes." State v. Williams, 190 N.J. 114, 131 (2007). "The fourth prong, whether the probative value of the evidence is outweighed by its apparent prejudice, is generally the most difficult part of the test." State v. Barden, 195 N.J. 375, 389 (2008).

Under the facts presented, the court did not abuse its discretion in denying defendant's motions to sever the child pornography and tampering/attempted destruction of evidence counts from the sexual assault counts. As the court noted, these crimes were inextricably intertwined and intrinsic to one another, in

that C.L. stated defendant was texting and watching television while he sexually abused her, suggesting he was using the laptop computer at the time. C.L. also testified to observing defendant masturbate while he was watching a movie on the laptop, and defendant attempted to destroy the child pornography on the laptop just minutes after M.L. called him from the AHCH, and minutes before the police arrived at his home to arrest him on the sexual assault charges. Thus, the court properly denied the severance motion because there was no way to tell the story of his arrest for sexual assault without also addressing the child pornography found in his possession at the time of his arrest, as well as his attempted destruction of the child pornography. See State v. Gorthy, 226 N.J. 516, 539 (2016).

Furthermore, performing an analysis under N.J.R.E. 404(b), the court reasonably concluded that all four prongs of the Cofield test were established: (1) the child pornography crimes were relevant to material issues regarding the sexual assaults, including defendant's intent and state of mind; (2) the child pornography crimes were similar in kind and reasonably close in time to the sexual assault offenses in that defendant possessed the pornography and attempted to destroy it near the time of his arrest for sexual assault; (3) the evidence of the child pornography crimes was clear and convincing and supported by expert

forensic analysis of defendant's computers; and (4) the probative value of the evidence did not outweigh its apparent prejudice.

We acknowledge the child pornography evidence was prejudicial to defendant. R. 3:15-2(b). However, the evidence was not prejudicial in the sense that N.J.R.E. 404(b) proscribes, i.e., that it would focus the jurors' attention on defendant's criminal character and divert their attention from their duty to consider only the crimes charged. See, e.g., Williams, 190 N.J. at 132. To the contrary, as the court found, the evidence of tampering/attempted destruction of the child pornography was relevant to defendant's state of mind, i.e., his consciousness of guilt for the sexual assaults. See id. at 125-34 (recognizing relevance of post-crime conduct to defendant's consciousness of guilt, particularly attempts to cover up crime).

As well, the jury could have considered the child pornography evidence with respect to defendant's motive, intent, and state of mind with respect to the sexual assault charges, because it demonstrated his sexual interest in children, which he denied at trial, and because it contradicted his claim that he would not have committed the alleged crimes because he would never hurt his daughter or any child. See Covell, 157 N.J. at 561, 566-71.

Finally, it is significant that in summation, defense counsel stated the State wanted the jurors "to believe that because there's

. . . child porn on there that he must be a child abuser."  The court sustained the State's objection and instructed the jury that the State did not want the jurors to make any such presumption, and the law required them to consider each charge separately.  In the main charge, the court also instructed the jurors in greater detail on their obligation to separately consider each alleged crime.  We conclude there was no abuse of discretion in the court's denial of defendant's motions to sever.

## VII.

Defendant contends in Point VI that the court erred in denying his motion to dismiss the indictment based upon the State's failure to present the grand jury with exculpatory evidence, namely, "C.L.'s repeated statements to investigators and professionals denying that [defendant] had engaged in any improper conduct." Defendant made a pretrial motion to dismiss the indictment, but it does not appear he raised this argument.  At most, he argued "that C.L. gave 'many inconsistent statements' in her statement concerning the alleged sexual assaults."  The court denied the motion, finding that:

> inconsistent statements do not rise to the level of "clearly exculpatory," to result in a dismissal of the indictment.  Those statements, if inconsistent, are ripe for cross-examination at trial and preserve defendant's Sixth Amendment right of confrontation.  Resolutions of factual

> disputes are not the province of the grand
> jury. [<u>State v. Hogan</u>, 144 N.J. 216, 235
> (1996).]

Also as relates to this issue, it is relevant that the grand jury presentation occurred on March 23, 2011. C.L.'s statement to Reed was taken a few months earlier, on November 30, 2010. However, the record does not indicate when the defense provided that statement to the State. Moreover, C.L.'s alleged recantations in therapy sessions occurred on July 5 and December 27, 2012, after the grand jury presentation.

We review motions to dismiss an indictment for abuse of discretion. <u>Id.</u> at 229. We discern no abuse of discretion here.

The grand jury is "an accusatory and not an adjudicative body." <u>Id.</u> at 235. Its duty is to determine whether the State has presented a prima facie case that a crime has been committed, and the defendant committed it. <u>Id.</u> at 228.

The prosecutor must present to a grand jury any evidence in its possession that directly negates the defendant's guilt and is clearly exculpatory. <u>Id.</u> at 236. However, in considering whether the prosecutor erred in not presenting such evidence, courts must give "due regard to the prosecutor's own evaluation of whether the evidence in question is 'clearly exculpatory.'" <u>Id.</u> at 238. Thus, it is anticipated that "only in the exceptional case will a prosecutor's failure to present exculpatory evidence to a grand

jury constitute grounds for challenging an indictment." Id. at 239.

Recantations by the victim are not viewed as clearly exculpatory. Id. at 239. Rather, they present questions of credibility to be resolved by a petit jury. Id. at 239-40. Thus, even assuming the State was aware of C.L.'s recantations before presenting evidence to the grand jury, which defendant has not established, "[t]he recantation did not affect the State's prima facie case of guilt against defendant, and thus the prosecutor did not commit misconduct in not revealing the recantation to the grand jury." Id. at 240. Moreover, the petit jury considered all of C.L.'s statements at trial, along with her trial testimony, and determined her recantations were not credible. United States v. Mechanik, 475 U.S. 66, 70 (1986); State v. Cook, 330 N.J. Super. 395, 411 (App. Div. 2000). Accordingly, we affirm the court's denial of defendant's motion to dismiss the indictment.

### VIII.

Defendant contends in Point VII that the court erred by denying his motion for judgment of acquittal, or alternatively, a new trial. He argues the evidence was insufficient to sustain a guilty verdict on all charges, and alternatively, that the cumulative trial errors previously discussed deprived him of a fair trial. Considering defendant's post-trial motions, the court

rejected his complaints about various evidentiary rulings, and concluded that the evidence at trial supported the jury's verdict.

A motion for judgment of acquittal under Rule 3:18-1 should be granted "if the evidence is insufficient to warrant a conviction."

> [T]he question the trial judge must determine is whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [State v. Reyes, 50 N.J. 454, 458-59 (1967).]

A motion for a new trial may be granted "if required in the interest of justice." R. 3:20-1. "The trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." Ibid.; R. 3:20-1; State v. Perez, 177 N.J. 540, 555 (2003). There is no manifest denial of justice if the jury rationally could have found defendant's guilt beyond a reasonable doubt. State v. Jackson, 211 N.J. 394, 413-14 (2012).

We agree with the court that since the evidence supported the jury's verdict on each charge of the indictment, defendant was not

entitled to a judgment of acquittal or a new trial based upon the weight of the evidence. In addition, we find no merit to his claim that he was deprived of a fair trial due to cumulative error, State v. Jenewicz, 193 N.J. 440, 473-74 (2008), and affirm the denial of his post-trial motion for judgment of acquittal or, alternatively, a new trial.

## IX.

Defendant challenges his sentence in Point VIII. He argues the sentence is draconian and unjust.

In issuing its sentence as to counts one, two, three, and four, the court found aggravating factors two, N.J.S.A. 2C:44-1(a)(2) (the gravity and seriousness of harm inflicted on the victim, including that the victim was particularly vulnerable to extreme youth), three, N.J.S.A. 2C:44-1(a)(3) (risk of re-offense), four, N.J.S.A. 2C:44-1(a)(4) (defendant took advantage of a position of trust or confidence to commit the offense), and nine, N.J.S.A. 2C:44-1(a)(9) (the need to deter). With respect to counts five, six, seven, and eight, the court found only aggravating factors three and nine.

The court found mitigating factors seven, N.J.S.A. 2C:44-1(b)(7) (defendant has no history of prior delinquency or criminal activity, noting as well defendant's years of military service), and eleven, N.J.S.A. 2C:44-1(b)(11) (defendant's imprisonment

would entail excessive hardship to his dependents, albeit self-imposed).  As to all counts, the court found the aggravating factors outweighed the mitigating factors.  Nevertheless, the court issued only mid- or low-range sentences.

Specifically, as to count one (first-degree aggravated sexual assault of a victim less than thirteen years old), with a sentencing range of ten-to-twenty years, N.J.S.A. 2C:43-6(a)(1), the court sentenced defendant to fifteen years.  As to count two (second-degree sexual assault of a victim less than thirteen years old), with a sentencing range of five-to-ten years, N.J.S.A. 2C:43-6(a)(2), the court sentenced defendant to seven years, consecutive to count one, since it was different in nature.

As to counts three (second-degree sexual assault of a victim less than thirteen years old), four (second-degree sexual assault of a victim less than thirteen years old), and five (second-degree endangering the welfare of a child), the court sentenced defendant to terms of seven years, concurrent to count two, since the crimes were similar in nature.

As to count six (third-degree hindering prosecution), with a sentencing range of three-to-five years, N.J.S.A. 2C:43-6(a)(3), the court sentenced defendant to a term of three years, consecutive to count counts one and two, because it was independent of the sexual assault offenses.

A-5783-13T1

As to count seven (fourth-degree endangering the welfare of a child by possessing child pornography), with a sentencing range of up to eighteen months, N.J.S.A. 2C:43-6(a)(4), the court sentenced defendant to a term of one year, consecutive to the other terms, because it was a completely different offense from the sexual assault and hindering offenses.

Finally, as to count eight (fourth-degree tampering with evidence by attempting to delete the child pornography), the court sentenced defendant to a term of one year, concurrent to count seven, since the two offenses occurred similar in time and had similar objectives.

Regarding each of the consecutive terms, the court made findings consistent with State v. Yarbough, 100 N.J. 627, 633-34 (1985). Finally, the court made findings that Megan's Law, parole supervision for life, and NERA applied to certain counts. Thus, the aggregate sentence imposed was twenty-six years, with twenty-two years subject to NERA.

We review a court's sentencing decision under an abuse of discretion standard. State v. Fuentes, 217 N.J. 57, 70 (2014). As directed by the Court, we must determine whether:

> (1) the sentencing guidelines were violated;
> (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the

guidelines to the facts of [the] case makes
the sentence clearly unreasonable so as to
shock the judicial conscience."

[Ibid. (alteration in original) (quoting State
v. Roth, 95 N.J. 334, 364-65 (1984)).]

We have considered defendant's contention in light of the
record and applicable legal principles and conclude it is without
sufficient merit to warrant discussion in a written opinion. R.
2:11-3(e)(2). We affirm substantially for the reasons the court
expressed at sentencing. We are satisfied that the court did not
violate the sentencing guidelines and the record amply supports
its findings on aggravating and mitigating factors. The sentence
is clearly reasonable and does not shock our judicial conscience.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5783-13T1